# In the United States Court of Federal Claims

| | |
|---|---|
| ERIC MEYER, *et al.*,<br>Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 25-cv-1535<br><br>Filed: August 26, 2026 |

*John W. Stewart* of McGillivary Steele Elkin LLP, Washington, D.C., argued for Plaintiff. With him on the briefs was *Rachel Lerner* of McGillivary Steele Elkin LLP, Washington, D.C.

*Brendan D. Jordan* of the United States Department of Justice, Civil Division, Washington, D.C., argued for Defendant. With him on the briefs were *Patricia M. McCarthy*, *Brett A. Shumate*, and *Reginald T. Blades, Jr.* of the United States Department of Justice, Civil Division, Washington, D.C.

**MEMORANDUM AND ORDER**

Federal Correctional Institution Mendota (FCI Mendota or prison), in Mendota, California is a medium security correctional facility housing male inmates who have been convicted of federal crimes, including narcotics distribution, rape, murder, and other violent offenses. ECF No. 10 (Amended Complaint or Am. Compl.) ¶ 9. Inmates serve sentences of varying lengths, up to life sentences. *Id.* Plaintiffs are current and former employees of the U.S. Department of Justice, Bureau of Prisons and work as correctional officers at FCI Mendota. *Id.* ¶ 5. Plaintiffs allege that their "principal activity is maintaining the safety and security of the Institution," a task that they allege they must perform "every moment that they are within the Institution from the moment they begin clearing the mandatory screening prior to their scheduled shifts until they exit the secure confines of the Institution after their scheduled shifts." *Id.* ¶ 10. Plaintiffs allege that they have

worked in excess of the hours permitted by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207, and are therefore entitled to overtime compensation for all hours worked in excess of eight hours in a workday or 40 hours in a workweek. Am. Compl. ¶¶ 1, 8.

Plaintiffs allege that they perform uncompensated work for at least 15-30 minutes each shift, and sometimes more after the end of their scheduled shifts. *Id.* ¶ 15. According to Plaintiffs, this uncompensated time begins when Plaintiffs "start the process of clearing the staff screening site" in the lobby of the prison. *Id.* ¶ 18. After clearing the screening, Plaintiffs don their duty belts and other equipment and then proceed to the "Control Center sally port" where they flip their accountability chit, proceed through the sally port, "walk down an outdoor walkway and clear a locked slider gate" and then are locked inside the prison compound and proceed to their posts.[1] *Id.* ¶ 21.

On January 16, 2026, Defendant filed a Motion to Partially Dismiss the Complaint pursuant to Rule 12(b)(6). ECF No. 11 (Motion). Defendant seeks to dismiss only Plaintiffs' claims for overtime compensation for time spent clearing the security screening in the lobby of the prison, and the time spent passing through the sally port prior to the start of their paid shifts. *Id.* at 6. For the reasons explained below, the Court **DENIES** Defendant's Motion to Partially Dismiss the Complaint (ECF No. 11).

---

[1] A sally port is "a secure entryway . . . that consists of a series of doors or gates,' that [P]laintiffs pass through on the way to their duty station." ECF No. 11 (Motion or Motion to Dismiss) at 15 (quoting "Sally port," Merriam Webster, https://www.merriam-webster.com/dictionary/sally%20port).

# FACTUAL BACKGROUND

Plaintiffs are current and former correctional workers "employed by the United States Department of Justice, Bureau of Prisons, at FCI Mendota in Mendota, California." Am. Compl. ¶ 5. They allege that "FCI Mendota is a medium security correctional facility that houses hundreds of male inmates who have been convicted of federal crimes, including violent offenders." *Id.* ¶ 9. The facility "is staffed 24 hours per day, 365 days a year by correctional officers, including Plaintiffs," who are assigned to 8-hour shifts at posts requiring surveillance coverage for 8, 16, or 24 hours per day. *Id.* ¶¶ 10–12. Plaintiffs allege that there is no paid overlap between officers as they transition between shifts, so that Plaintiffs are required to "be on their assigned posts, in uniform and with all assigned equipment and pertinent post information, by the scheduled start of their paid shift." *Id.* ¶ 13. As a result, when assigned to a 24-hour post, plaintiffs perform "at least 15–30 minutes" of overtime work before and after their shifts without compensation. *Id.* ¶¶ 14–15.

Plaintiffs allege that their unpaid pre-shift work begins "when they start the process of clearing the staff screening site in the front lobby," where they "work [] to ensure no contraband enters the Institution" as required by Defendant. *Id.* ¶ 18. According to Plaintiffs, this screening is required by Defendant to ensure that "weapons and other contraband" are kept out of the Institution, and the screenings cannot be eliminated without "impairing the Plaintiffs' ability to complete their work because they could not guarantee a contraband-free environment." *Id.* They then "collect and don their duty belts . . . which are essential and required to securely hold keys and access mandatory equipment." *Id.* ¶ 19. Plaintiffs cannot don their duty belts earlier because the belts, "with metal chains and chits," would set off the metal detector at the staff screening site. *Id.* Afterward, Plaintiffs proceed to the Control Center Sally Port, where they are visually

identified by a Control Center officer who then allows them into the sally port where they "flip their accountability chit signifying that they are on duty." *Id.* ¶ 21. Plaintiffs allege they then continue actively "maintaining safety and security" as they walk to their assigned posts because they are "in uniform and identifiable to the inmates and staff as correctional officers, and remain vigilant, alert, and ready to (and do) respond to emergencies." *Id.* ¶ 20.

Plaintiffs allege that they perform additional post-shift activities without compensation, including "exchanging information and equipment on the assigned post with oncoming staff, remaining vigilant, alert, and ready to respond to emergencies while within the secured confines of the Institution, supervising and monitoring inmates, observing and correcting inmate behavior, looking for contraband," and responding to alarms. *Id.* ¶ 30. Plaintiffs state they are required to respond to emergencies in their unpaid time when walking to and from their posts, and failure to do so would result in disciplinary action. *Id.* ¶ 31.

Plaintiffs allege that they spend at least 15-30 minutes per shift performing "compensable" but unpaid work: clearing the security screening, walking to their posts, exchanging information and equipment, and walking from their posts. *Id.* ¶ 33. Throughout these activities, Plaintiffs allege they are "maintaining safety and security" in the prison by "maintaining constant vigilance to monitor for contraband and ensure that nothing out of the ordinary is occurring, and immediately addressing any issues including, correcting inmate behavior and interacting with inmates, no matter the location and time of day that it occurs" and "running to locations where body alarms sound, and responding to other emergencies as they arise." *Id.* ¶¶ 10, 22–23. Plaintiffs seek "backpay and liquidated damages in an amount equal to their backpay" due to defendant's failure to pay overtime in compliance with the FLSA. *Id.* ¶ 45. Plaintiffs also seek attorneys' fees and costs. *Id.* ¶ 47.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 16, 2025. ECF No. 1 (Complaint). On December 19, 2025, Plaintiffs filed a Motion for Leave to Amend Complaint to update the caption "to include the names of 137 party-plaintiffs who opted into this litigation on September 25, 2025." ECF No. 9 at 1 (Motion for Leave to File). The Court granted the Motion for Leave to File on December 22, 2025, and Plaintiffs filed their Amended Complaint on the same day. Minute Order dated Dec. 22, 2025; Am. Compl.

On January 16, 2026, Defendant filed its Motion to Partially Dismiss the Complaint. Motion. On February 13, 2026, Plaintiffs filed their Opposition to Defendant's Motion to Partially Dismiss the Complaint. ECF No. 12 (Response). On March 6, 2026, Defendant filed its Reply in Support of Defendant's Motion to Dismiss Part of the Complaint. ECF No. 14 (Reply). On March 11, 2026, Plaintiffs filed a Notice of Supplemental Authority regarding *Hodge v. North Carolina Dept. of Adult Correction*, No. 5:19-cv-478-BO, 2026 WL 579933 (E.D.N.C. Mar. 2, 2026). ECF No. 16 (Notice I). On March 30, 2026, Plaintiffs filed a Notice of Supplemental Authority regarding *Stroup v. United States*, 180 Fed. Cl. 346 (2026). ECF No. 19 (Notice II). On April 14, 2026, Defendant filed a Response to Notice II. ECF No. 20 (Response to Notice II). The Court held oral argument on this Motion on May 12, 2026. Minute Order dated May 12, 2026.

## LEGAL STANDARD

### I. Rule 12(b)(6)

To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff also must establish "more than a sheer possibility that a defendant has

acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "The Court of Federal Claims may properly grant a motion to dismiss under [Rule] 12(b)(6) when a complaint does not allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

"Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998). However, at the motion to dismiss stage, this Court must "take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025) (quoting *Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir. 2017)). At the motion to dismiss stage, "detailed factual allegations" are not necessary. *Twombly*, 550 U.S. at 555.

## STATUTORY FRAMEWORK

### I. The Fair Labor Standards Act

In 1938, Congress enacted the Fair Labor Standards Act (FLSA) to require overtime compensation at a rate of one and one-half an employee's regular rate for employees who work more than 8 hours a day or 40 hours in a work week. 29 U.S.C. § 207(a)(1); *see also* 5 C.F.R. § 551.501(a). The Department of Labor (DOL) is responsible for implementing the FLSA for non-federal workers, and the Office of Personnel Management (OPM) for federal workers. 29 U.S.C. §§ 204(a), (f). Congress subsequently passed the Portal–to–Portal Act which amended the FLSA and clarified that the following activities are exempt from coverage under the FLSA:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

However, the Supreme Court has held that "activities performed either before or after the regular work shift . . . are compensable under the portal-to-portal provisions of the [FLSA] if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014).

In *Integrity Staffing*, the Supreme Court held that time spent by warehouse employees going through an anti-theft security screening at the end of the workday was not compensable, because undergoing these screenings was not an "intrinsic element of retrieving products from warehouse shelves or packaging them for shipment" and because the employer could have "eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.* at 35.

## II. The Continuous Workday Doctrine

The Portal-to-Portal Act contains a provision that defines certain activities, like walking, as non-compensable when they "occur either prior to the time on any particular workday at which [an] employee commences, or subsequent to the time on any particular workday at which he

ceases, such principal activity or activities." 29 U.S.C. § 254(a). However, "[c]ourts have interpreted this portion of the statute to mean that activities which would otherwise be excluded from the FLSA by the Portal-to-Portal Act could be compensable if they occur during the employees' 'workday.'" *Stroup*, 180 Fed. Cl. at 355 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28–29 (2005)). This is the "continuous workday rule." *Alvarez*, 546 U.S. at 29–30.

**DISCUSSION**

Defendant seeks to dismiss Plaintiffs' claims for (i) time spent passing through the pre-shift security screening, and (ii) time spent in the sally port. Construing all facts in the light most favorable to Plaintiffs, Plaintiffs have alleged sufficient facts in their Amended Complaint to plausibly claim that the time they spent undergoing the prison's security screening and passing through the sally port is either part of their principal activity or is integral and indispensable to their principal activity of employment.

## I. The Security Screening Claim

Defendant asserts that Plaintiffs have failed to state an FLSA claim for time spent passing through the security screening prior to their shifts because (1) passing through a security screening is not a principal activity that the plaintiffs are employed to perform and (2) it is also not integral or indispensable to a principal activity. Mot. at 13. Defendant argues that, as a matter of law, "security screenings are neither principal activities nor integral or indispensable to principal activities." Mot. at 14 (quoting *Baytos v. United States*, 175 Fed. Cl. 360, 371 (2025) (*Baytos II*) and citing *Medrano v. United States*, 159 Fed. Cl. 537, 545 (2022), *Alkire v. United States*, 158 Fed. Cl. 380, 391–93 (2022), and *Aitken v. United States*, 162 Fed. Cl. 356, 365 (2022)). Defendant argues that this case is analogous to *Integrity Staffing*, where the Supreme Court concluded that post-shift anti-theft security screenings for warehouse workers were not integral and indispensable

to their duties, but instead that the security screening is "essentially part of the ingress . . . process" of arriving at Plaintiffs' duty post. Mot. at 14 (quoting *Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring)).

In response, Plaintiffs argue that the correctional officers undergoing security screening in this case are distinct from the warehouse workers undergoing security screening in *Integrity Staffing*, since there, the security screening of the warehouse workers was not "tied to" their principal activities, whereas here the screening is "tied to" Plaintiffs' principal activity of maintaining the safety and security of the prison. Resp. at 19–20; *see Integrity Staffing*, 574 U.S. at 36 ("The integral and indispensable test is tied to the productive work that the employee is *employed to perform*." (emphasis in original)). In *Integrity Staffing*, the Supreme Court held that an activity is integral and indispensable to the principal activities an employee is employed to perform when "it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.* Plaintiffs argue that here, searching for contraband is an intrinsic element of their principal activity, and they could not dispense with undergoing the security screening without "impairing the officers' ability to provide security and search for contraband" since there would be no way to guarantee that Plaintiffs themselves are not invertedly introducing contraband into the prison environment. Resp. at 17, 19 (citing *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1279 (10th Cir. 2020)); Am. Compl. ¶ 18. Defendant contends that on the contrary, even if the prison had no security screening process for Plaintiffs and instead Plaintiffs were trusted to "police themselves to not bring any contraband into the prison" that they could still perform their principal activity. Mot. at 16 (citing *Integrity Staffing*, 574 U.S. at 33 and *Medrano*, 159 Fed. Cl. at 545).

Whether the security screening could be dispensed with without impairing the Plaintiffs' ability to perform their principal activity, as Plaintiffs have plausibly alleged in their complaint, is a question of fact that cannot be resolved at the motion to dismiss stage. *See, e.g.*, *Stroup*, 180 Fed. Cl. at 353 (rejecting Defendant's argument that if the prison "did not conduct security screening[s] and trusted the [P]laintiffs to police themselves to not bring any contraband into the prison, [P]laintiffs could still perform the principal activities they are employed to perform" as "rely[ing] on fact-finding" that could not be resolved on a motion to dismiss (alterations in original)). Plaintiffs have plausibly claimed that eliminating the screening would interfere with their principal activity of maintaining safety and security in the prison since eliminating the screenings would "impair[] the Plaintiffs' ability to complete their work because they could not guarantee a contraband-free environment." Am. Compl. ¶ 18; *Integrity Staffing*, 574 U.S. at 35 ("[A]n activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities."). Accordingly, Plaintiffs have alleged facts sufficient to withstand a motion to dismiss. *See* Rule 12(b)(6).

Moreover, even if this was not the case, Plaintiffs and Defendant also agree that there is a factual dispute as to whether Plaintiffs perform *additional* duties tied to their principal activity while they undergo the security screening, in addition to preventing contraband from entering the facility. Am. Compl. ¶ 10 (Plaintiffs' principal activity is "maintaining the safety and security" of the prison, an activity they perform "from the moment they begin clearing the mandatory security screening prior to their scheduled shift" and which they perform by "maintaining constant vigilance to monitor for contraband and to ensure that nothing out of the ordinary is occurring, [and] correcting inmate behavior and interacting with inmates."); ECF No. 22 (Oral Argument

Transcript or OA Tr.) at 58:6–15 (Plaintiffs' counsel: "One other way in which they're performing their principal activity in the lobby itself is by . . . correct[ing] any problems they see with those inmates. That is them performing their duty to be ready to do that in the presence of inmates as they proceed into the institution."); OA Tr. at 85:3–4 (The Court: "So you're saying they're on duty as soon as they sort of get to that front lobby?"); *id.* at 85:8–15 (Defendant's counsel: "I think there's a question of . . . well, if they're on their way to their post and a fight breaks out or an inmate does something, can the correction officer say, 'I don't care,' . . . I've heard different things from different managers of prison."). As Plaintiffs have alleged that they perform other duties while in the lobby undergoing the security screening, specifically remaining vigilant to anything out of the ordinary and interacting with inmates who may be present, and as Defendant concedes that this factual claim is an open question that cannot be resolved at this stage, the Court cannot characterize the time Plaintiffs spend passing through the screening as mere non-compensable "ingress" as a matter of law. Am. Compl. ¶ 10; Mot. at 13; OA Tr. 80:2–4 (Defendant's counsel: "I think if we go to discovery, it will show that . . . inmates are not present in the front lobby."); *Medrano*, 159 Fed. Cl. at 550 (denying a motion to dismiss for time correctional officer plaintiffs spent walking to their posts because plaintiffs had alleged that they were "'correct[ing] inmate behavior, 'respond[ing] to any security breaches,' 'identify[ing] safety issues,' [and] handling emergencies" while walking); *Baytos II*, 175 Fed Cl. at 372 (declining to decide as a matter of law that work was not compensable when disputed issues of fact remained concerning "how often [correctional officers] encounter prisoners in this area and what the [correctional officers] are required to do"). Accordingly, for this reason and based upon the allegations in Plaintiffs' Amended Complaint, at this stage the Court must deny the Motion as to the time Plaintiffs spend passing through the security screening. *See* Rule 12(b)(6).

## II. The Sally Port Claim

Defendant also moves to dismiss any claims related to the time that Plaintiffs spend passing through the sally port on the way to their assigned shifts. Mot. at 20. Defendant argues that passing through a sally port is not a principal activity, nor is it integral or indispensable to a principal activity, but instead that it is merely ingress into the prison facility. *Id.* at 21.

Plaintiffs argue that they are performing their principal activities of maintaining the safety and security of the prison while passing through the sally port. Resp. at 30. Plaintiffs also assert that this time is compensable under the continuous workday doctrine, since they pass through the sally port immediately after donning their work equipment and since many courts and other arbitrators, including the Court of Federal Claims, have recognized donning work equipment as "integral and indispensable" to the work of correctional officers in other prisons. *Id.* at 23–24 (citing *Adegbite v. United States*, 156 Fed. Cl. 495, 507–08 (2021); *Maciel v. City of Los Angeles*, 569 F. Supp. 2d 1038, 1049 (C.D. Cal. 2008); *Echeverria v. Nevada*, No. 3:14-cv-320, 2022 WL 1652450, *12 (D. Nev. May 23, 2022); *AFGE Local 525 v. FCI Williamsburg*, FMCS No. 08-56529 (May 22, 2012) (Harris, Arb.) at 68-72). Plaintiffs contend that therefore, under the continuous workday doctrine, all time spent after the "first principal activity of the day [until] the conclusion of the last principal activity of the day," including time spent in the sally port, is compensable work. *Id.* at 24–25.

### A. Plaintiffs sufficiently allege that the time in the sally port is compensable work.

As noted, Plaintiffs contend they have sufficiently alleged that the time they spend in the sally port is compensable work, since from the "moment correctional officers pass through the sally port, they are locked inside the Institution, with all the dangers, responsibilities, and job duties that entails." Resp. at 29–30. As asserted in their Amended Complaint, Plaintiffs claim that at all

times after they "clear the staff screening site," they are performing their principal activity of "maintaining the safety and security of the Institution" because they "at all times, are in uniform and identifiable to the inmates and staff as correctional officers, and remain vigilant, alert, and ready to (and do) respond to emergencies." Am. Compl. at ¶¶ 10, 20. Defendant counters that the time plaintiffs spend in the sally port is nothing more than part of a "non-compensable ingress process" to reach their assigned posts and is therefore not "integral or indispensable to [P]laintiffs' work." Mot. at 21. At the current motion to dismiss stage, Plaintiffs have alleged sufficient facts in their Amended Complaint to make a plausible claim that they are either performing their principal activity of maintaining the safety and security of the institution while in the sally port or performing activities that are integral and indispensable to their principal activity.

Principal activities are those activities which employees are "employed to perform" and an activity is "'integral and indispensable' if it is an intrinsic element of the employee's principal activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 28. Here, Plaintiffs allege that their principal activity is maintaining the safety and security of the prison, and that for all times *after they clear the staff security screening site*, that they perform this principal activity "on the way to their assigned posts inside the secure confines of the Institution because they, at all times, are in uniform and identifiable to the inmates and staff as correctional officers, *and remain vigilant, alert, and ready to (and do) respond to emergencies*." Am. Compl. ¶¶ 10, 20 (emphasis added). Plaintiffs pass through the sally port after passing through the staff security screening and therefore allege that they are performing these duties while in the sally port. *Id.* ¶¶ 19, 20. The Court finds it to be at least plausible that correctional officer Plaintiffs are required to remain vigilant, alert, and ready to respond to emergencies even while in a sally port as part of their commute to their posts. *See*

*e.g., Stroup*, 180 Fed. Cl. at 354 ("The officers' description of the activities they perform while in the sally port sufficiently support[s] the allegation that passing through the sally port is, at least, integral and indispensable to their principal activity of 'maintaining security' . . . includ[ing] being in uniform and available to respond to emergencies as they arise, which reflect the principal duties of a correctional officer."); *Baytos I*, 2022 WL 598742 at *8 (finding that plaintiffs' claim that "clearing the sally port . . . [is] integral and indispensable to their principal activity of maintaining the safety and security of the Institution" to be plausible "because, among other things, they, at all times, are in uniform, [and] identifiable to the inmates and staff as correctional officers").

Moreover, at oral argument Defendant acknowledged that the extent to which Plaintiffs may be required to respond to emergencies while passing through the sally port is in dispute. OA Tr. at 82:15–83:2 ("[I]f there's an emergency, . . . the facts of whether they can, whether they do, that's all to be decided later."). Accordingly, at this initial stage, Plaintiffs have alleged sufficient facts to withstand the motion to dismiss for time spent passing through the sally port. *See* Am. Compl. ¶ 20.[2]

[2] Plaintiffs also assert that they are entitled to compensation for time spent passing through the sally port under the continuous workday doctrine. Am. Compl. ¶ 20; Resp. at 23. Defendant argues that the continuous workday doctrine does not apply to federal employees. Mot. at 22 (citing *Baytos II*, 175 Fed. Cl. at 369). As the Court has already denied the Motion as to the sally port claim on a different theory, the Court "declines to issue an advisory opinion" addressing the applicability of the continuous workday doctrine at this stage since it is not necessary to rule on the Motion. *See Bieganowski v. United States*, No. 26-165, 2026 WL 2225221, at *8 n.5 (Fed. Cl. July 14, 2026) (declining to address additional jurisdictional arguments after the Court had already found that it lacked jurisdiction).

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Partially Dismiss the Complaint (ECF No. 11).

IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

August 26, 2026
Washington, D.C.